**FOURTH DIVISION
DILLARD, P. J.,
RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 15, 2017**

# In the Court of Appeals of Georgia

A17A0265. BELLSOUTH TELECOMMUNICATIONS LLC d/b/a AT&T GEORGIA et al. v. COBB COUNTY, GEORGIA et al.

RAY, JUDGE.

Defendants Bellsouth Telecommunications, LLC, and Earthlink, Inc., Earthlink, LLC, Deltacom, LLC, and Business Telecomm, LLC (collectively, "Defendants") filed this interlocutory appeal from the trial court's denials of their motions to dismiss the complaints by Cobb County, Georgia and Gwinnett County, Georgia (collectively, the "Counties") regarding the Defendants' alleged violations of the Georgia Emergency Telephone Number 9-1-1 Service Act of 1977, OCGA § 46-5-120 et seq (the "9-1-1 Act").[1] The 9-1-1 Act requires telephone customers to pay a monthly charge to the telephone companies, which act as middlemen to collect and

---

[1] The United States Telecom Association and Incompas, as well as the Georgia Chamber of Commerce, have filed amicus curiae briefs in this case.

remit the collected charges to local governments that run 9-1-1 call centers and dispatch emergency services. See OCGA § 46-5-134 (a)-(b). The Counties allege that the Defendants purposefully did not bill – and therefore, their customers did not pay – enough 9-1-1 charges under the statute. The Counties seek to hold the Defendants liable for damages equal to the amount of 9-1-1 charges owed by their customers, as well as for punitive damages.

We agree with the Defendants that the 9-1-1 Act does not explicitly or implicitly sanction a direct right of action by the Counties against the Defendants due to their alleged failure to bill or collect the required fees, but also find that the Counties may pursue their claims against the Defendants for the alleged failure or refusal to collect the 9-1-1 charges pursuant to OCGA §§ 51-1-6 and 51-1-8. However, the viability of any common law claims may turn on whether the 9-1-1 charges are taxes or fees. As any decision thereon is premature at this stage of the proceedings, we remand this issue for further consideration.

## BACKGROUND

In 1977, the General Assembly passed the 9-1-1 Act to "establish and implement a cohesive state-wide emergency telephone number 9-1-1 system which will provide citizens with rapid, direct access to public safety agencies by dialing

2

telephone number 9-1-1 [.]" OCGA § 46-5-121 (a). The 9-1-1 Act authorizes a local government to pay for the 9-1-1 services it provides by "impos[ing] a monthly 9-1-1 charge upon each telephone service" that is or would be served by the 9-1-1 service. OCGA § 46-5-133 (a). The 9-1-1 Act broadly describes "telephone service" as "any method by which a 9-1-1 emergency call is delivered to a public safety answering point[,]" and includes

> local exchange telephone service or other telephone communication service, wireless service, prepaid wireless service, mobile telecommunications service, computer service, Voice over Internet Protocol service, or any technology that delivers or is required by law to deliver a call to a public safety answering point.

OCGA § 46-5-122 (16.1).

The 9-1-1 Act makes telephone companies intermediaries between local governments and citizens for the purpose of collecting the funds necessary to implement the 9-1-1 service and dispatch centers. It provides that telephone customers "may be billed for the monthly 9-1-1 charge" of up to $1.50 for each

3

subscription per telephone service provided. OCGA § 46-5-134 (a) (1) (A).[2] The specific language of the Act provides:

> Each service supplier shall, on behalf of the local government, collect the 9-1-1 charge from those telephone subscribers to whom it provides telephone service in the area served by the emergency 9-1-1 system. As part of its normal billing process, the service supplier shall collect the 9-1-1 charge for each month a telephone service is in service, and it shall list the 9-1-1 charge as a separate entry on each bill.

OCGA § 46-5-134 (a) (1) (B). The same requirement applies to wireless service, except for services billed to federal, state or local governments. See OCGA § 46-5-134 (a) (2) (C). Further, "[e]ach service supplier that collects 9-1-1 charges" may "retain . . . an administrative fee" and "[t]he remaining amount shall be due quarterly to the local government[.]" OCGA § 46-5-134 (d) (1). The 9-1-1 Act further grants local governments the right to "audit or cause to be audited the books and records of

---

[2] When a customer "has several telephone access lines, each exchange access facility shall constitute a separate subscription." OCGA § 46-5-122 (17). "Exchange access facility" is defined as "the access from a particular telephone subscriber's premises to the telephone system" of a telephone company and includes, inter alia, service supplier-provided access lines, PBX trunks, Centrex network access registers, and Voice over Internet Protocol service suppliers and any other communication, message, signal, or information delivery system capable of initiating a 9-1-1 emergency call. OCGA § 46-5-122 (7).

4

service suppliers with respect to the collection and remittance of 9-1-1 charges." OCGA § 46-5-134 (d) (4).

The Counties sued the Defendants alleging that they should have billed two classes of customers a larger amount of 9-1-1 charges. The Counties argued that Defendants were required to, but did not, bill a 9-1-1 charge for all of the "exchange access lines, channels, or pathways" available to customers that purchased "multiplex" services, which can carry multiple simultaneous calls over a single physical line, and that Defendants were required to, but did not, bill a 9-1-1 charge for every 10-digit telephone number provided to users of VoIP technology.[3] The complaints, inter alia, assert damages claims arising out of these alleged violations of the 9-1-1 Act and arising out of common law theories of recovery, and seek to enforce the 9-1-1 Act's audit provision.

---

[3] Voice over Internet Protocol service ("VoIP") is "any technology that permits a voice conversation using a voice connection to a computer . . . which sends a digital signal over the Internet through a broadband connection to be converted back to the human voice at a distant terminal[.]" OCGA § 46-5-122 (17.1).

The Defendants moved to dismiss the Counties' complaints. After a consolidated oral argument, the trial court denied the motions to dismiss.[4] In its order, the trial court held that the 9-1-1 charges constitute fees, rather than taxes; that the lawsuit was permissible because there is "no express language" preventing the Counties from bringing the action and that "it is implausible that the General Assembly would confer auditing powers without a corresponding remedy;" and that the Counties could enforce the 9-1-1 Act through common law claims based on alleged violations of the 9-1-1 Act. This Court granted the Defendants' application for interlocutory review.

---

[4] The trial court should not grant a motion to dismiss a complaint for failure to state a claim upon which relief may be granted unless:

> (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor.

(Citations omitted.) *Best Jewelry Mfg. Co., Inc. v. Reed Elsevier, Inc.*, 334 Ga. App. 826, 826-827 (780 SE2d 689) (2015) (cert denied).

6

*ANALYSIS*

1. The parties agree that the 9-1-1 Act does not contain an express right of action authorizing local governments to enforce the statute against telephone companies and service suppliers. However, the Plaintiff Counties allege and the trial court found that the statutory scheme of the 9-1-1 Act indicates an intent by the General Assembly to give local governments an implied right of action for damages against telephone companies and suppliers based upon a violation of the statute. The trial court reasoned that it was implausible that the General Assembly would confer auditing powers to local governments without a corresponding remedy if they were to discover that a telephone company or service supplier had not collected and/or remitted the proper amount owed to them under the statute. The Defendants argue that this ruling was in error; we agree that the trial court so erred.

Georgia has "longstanding precedential authority rejecting the creation of implied private rights of action[.]" (Footnote omitted.) *Somerville v. White*, 337 Ga. App. 414, 417 (787 SE2d 350) (2016). See also *Govea v. City of Norcross*, 271 Ga. App. 36, 41 (1) (608 SE2d 677) (2004) ("[I]t is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof") (footnote omitted). In 2010,

7

the General Assembly codified this presumption in OCGA § 9-2-8 (a), which provides that "[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is expressly provided therein." Our Supreme Court has noted that the creation of OCGA § 9-2-8 revealed the General Assembly's concern over "judicial creation of implied civil causes of action[.]" *Anthony v. American Gen. Fin. Servs., Inc.*, 287 Ga. 448, 459 (2) (c) (697 SE2d 166) (2010). Although OCGA § 9-2-8 (a) "would not apply to the pre-existing [9-1-1 Act] at issue in this case, . . . it certainly counsels against deviating from our established precedent to find new implied civil causes of action." Id.

As noted above, all parties concede that the 9-1-1 Act does not contain an express right of action that would allow the Counties to bring the claims in this lawsuit against the Defendants. See generally OCGA § 46-5-120, et seq. Accordingly, the Counties bear the burden of overcoming Georgia's presumption against implied rights of action. See *Brooks-Powers v. Metropolitan Atlanta Rapid Transit Auth.*, 260 Ga. App. 390, 392 (1) (579 SE2d 802) (2003). This they cannot do.

Although the 9-1-1 Act does not provide that local governments have a right of action against telephone *companies*, it does provide a similar right of action against telephone *customers*. Specifically, the 9-1-1 Act provides that telephone customers

8

are "liable for the 9-1-1 charge[] . . . until it has been paid to the service supplier." OCGA § 46-5-134 (b). Under the 9-1-1 Act, if a customer refuses to pay the 9-1-1 charge, then the telephone company is to inform the local government, which may "initiate[]" a "collection action" against that customer. Id. While the legislature also could have specifically created a cause of action for a breach of the 9-1-1 Act against telephone service providers by its terms, it did not choose to do so.

Not to be deterred, the Counties claim and the trial court held that the audit provisions of the 9-1-1 Act gave rise to an inference that the General Assembly intended that local governments could sue telephone service providers. See OCGA § 46-5-134 (d) (4) (The 9-1-1 Act provides that a "local government may on an annual basis, and at its expense, audit or cause to be audited the books and records of service suppliers with respect to the collection and remittance of the 9-1-1 charges"). However, again, had the General Assembly intended within the statute itself to make the Defendants or other telephone service providers liable for amounts not collected from customers, then it knew how to do so.[5] See e. g., OCGA § 48-8-7

---

[5] In their supplemental brief, the Counties argue that Section 14 (b) of the Senate Bill 222 from the 2017 legislative session indicates that the General Assembly intended to preserve an implied cause of action under the 9-1-1 Act. However, we fail to see how legislation passed 40 years after the 9-1-1 Act was enacted clarifies what the intent was of the original General Assembly which passed the Act, and in any

(a) - (b) (making it "unlawful for any dealer to knowingly and willingly fail, neglect, or refuse to collect" from its customers a sales and use tax, and imposing a "penalty of being liable for and paying the tax himself" if a dealer violates the statute).[6]

Contrary to the Counties' assertion, , it is plausible that the General Assembly would make service providers subject to an audit (but not confer a right of action against them) since the service providers are the parties that hold the records regarding the 9-1-1 taxes charged to and paid by others, namely, their customers.[7] Further, the audits could lead to retroactive collection by the local governments against end-users who did not pay the appropriate amounts of 9-1-1 charges or lead to prospective changes to the service supplier's manner of billing.

---

event, Senate Bill 222 was vetoed by Georgia's governor and did not become law.

[6] See also OCGA § 48-13-59 (a) - (b) (making it unlawful "for any innkeeper to fail, neglect, or refuse to collect the [hotel] tax," and imposing a "penalty of being liable for and paying the tax himself" as well as a misdemeanor charge punishable by a fine or imprisonment if the statute is violated); OCGA § 48-13-124 (a) - (b) (making it unlawful for any dealer to "knowingly and willfully fail, neglect, or refuse to collect the [energy tax]" and imposing a penalty of "being liable for and paying the tax himself" as well as a "misdemeanor of high and aggravated nature" punishable by a fine or imprisonment if the statute is violated).

[7] See OCGA § 46-5-134 (m) (2) (providing that the local government may be held liable to subscribers for pro rata reimbursement of funds not spent according to the 9-1-1 Act).

The Counties next allege that an implied right of action exists because the 9-1-1 Act gave them the power to "bring and defend actions." OCGA § 46-5-138 (c) (1). However, the fact that the Counties may sue or be sued does not confer a right of action; it merely confers the capacity to sue. The Eleventh Circuit rejected a similar argument in *Smith v. Russellville Production Credit Assn.*, 777 F.2d 1544, 1548 (I) (11th Cir. 1985). *Smith* held that the appellants' argument

> in support of an implied right of action, that the inclusion of a 'sue and be sued' provision in the Farm Credit Act is evidence that Congress intended to create a private right of action under that act, is completely without merit. The 'sue and be sued provision' simply indicates that Congress intended that [Production Credit Associations ("PCAs")], like other private entities, be held accountable for breaking the law and be able to seek relief under appropriate circumstances. The provision does not indicate that Congress intended, in enacting the Farm Credit Act, to create an independent substantive legal basis under which PCAs could be sued.

Id.

In summary, we disagree with the trial court's finding that the 9-1-1 Act provides an implied right of action to the Counties for the Defendants' alleged failure to collect the proper amount of fees under the statute.

2. The Defendants next argue that the trial court erred in concluding that the 9-1-1 Act, when read in conjunction with OCGA §§ 51-1-6 and 51-1-8, provides the Counties with common law remedies against the Defendants or any other telephone service provider. As to this point, we hold that the Counties may pursue claims against the Defendants due to their alleged failure or refusal to collect these charges; the 9-1-1 Act imposed a duty upon the Defendants to do so, and OCGA §§ 51-1-6 and 51-1-8 allow the Counties to enforce that statutorily imposed duty.[8]

"The language of OCGA §§ 51-1-6[9] and 51-1-8[10] does not confer a separate cause of action in tort upon one who has suffered a breach of a legal or a private duty." *Parris*, supa at 524. Rather, they operate in conjunction with a statute, such as

---

[8] At this time, we do not address whether and/or to what extent common law might also impose a duty upon the Counties that could be enforced under these statutes. The viability of these common law claims will more appropriately be tested pursuant to a motion for summary judgment after discovery. We refrain from ruling thereon until the "tax" versus "fee" issue is resolved, as discussed in Division 3 herein.

[9] OCGA § 51-1-6 states that "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."

[10] OCGA § 51-1-8 provides that "[p]rivate duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action."

12

the 9-1-1 Act, that imposes a legal duty but does not expressly provide a cause of action. See also *Dupree v. Keller Indus., Inc.*, 199 Ga. App. 138, 141 (1) (404 SE2d 291) (1991). The Counties argue that the 9-1-1 Act imposes upon the providers a duty to bill and collect the 9-1-1 charges for all voice lines or pathways capable of reaching 9-1-1 call centers, and to remit those fees to the Counties according to the terms of the statute (See OCGA § 46-5-134 (a) (1) (B) (telephone service providers "shall collect" 9-1-1 charges)), thus giving rise to their claims due to the providers' alleged failure or refusal to do so. The duty to bill and collect the charges imposed by the 9-1-1 Act falls within the ambit of OCGA §§ 51-1-6 and 51-1-8, even though they arise from a statute that does not directly provide for a private cause of action. See, e.g., *Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 705-706 (3) (746 SE2d 173) (2013) (violations of Georgia Water Quality Control Act, Georgia Waste Control Act and Georgia Erosion and Sedimentation Control Act "fall within the ambit of OCGA § 51-1-6"); *Dupree*, supra at 141-142 (1) (violation of federal OSHA regulations are admissible as evidence of and give cause of action when in concert with OCGA § 51-1-6).

We do not agree with the Defendants' argument that *Best Jewelry Mfg. Co., Inc.,* supra, and *U. S. Bank, N. A. v. Phillips*, 318 Ga. App. 819 (734 SE2d 799)

(2012), require a different result. In *Best Jewelry*, supra, the plaintiff filed a class action, inter alia, on the grounds that the superior court's e-filing system, as implemented, violated various statutes and regulations. Id. at 830 (1) (a) (i). This Court affirmed the trial court's grant of a motion to dismiss these claims, finding that the claims had no basis other than statutory violations and that the plaintiff failed to plead "facts sufficient to show violations" of the statutes. Id. at 830 (1) -834 (1) (b). In *U. S. Bank, N. A.*, supra, this Court affirmed the trial court's grant of a motion to dismiss the plaintiffs' claim under OCGA § 51-1-6 for negligent implementation of the Federal Home Affordable Modification Program because the homeowner/plaintiff was not the intended third-party beneficiary to whom the defendant owed a legal duty. Id. at 820. The cases relied upon by the amici curiae briefs, *Reilly v. Alcan Aluminum Corp*, 272 Ga. 279, 280 (1) (528 SE2d 238) (2000) and *Mattox v. Yellow Freight Sys., Inc.*, 243 Ga. App. 894, 895 (534 SE2d 561) (2000) are also distinguishable. Both of those cases involve specific *prohibitions* against liability, unlike this case.

Further, both OCGA §§ 51-1-6 and 51-1-8 were passed in 1863, prior to the passage of the 9-1-1 Act in 1977. Thus,

we must presume that the General Assembly had full knowledge of the existing state of the law and enacted the statute with reference to it. We

14

construe statutes in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts.

(Punctuation and footnotes omitted.) *Chase v. State*, 285 Ga. 693, 695-696 (2) (681 SE2d 116) (2009). See also *Barbush v. Oiler*, 158 Ga. App. 625, 625 (281 SE2d 359) (1981) ("Statutes are to be construed in connection and in harmony with existing law") (citation and punctuation omitted). Thus, in enacting the 9-1-1 Act, the General Assembly would have been aware of the right of local governments to pursue claims under OCGA §§51-1-6 and 51-1-8 if the telephone companies did not properly collect these charges.

3. The Defendants argue that the trial court erred in concluding that the 9-1-1 charge imposed by the 9-1-1 Act is a "fee" rather than a "tax," and contend that if the trial court had properly classified the charge as a tax, that it would have had no choice but to dismiss the Counties' claim pursuant to our holding in *Fulton County v. T-Mobile, South, LLC*, 305 Ga. App. 466 (699 SE2d 802) (2010). In essence, the Defendants argue that if the charges at issue are taxes, that a common law action for the recovery of the taxes will not lie. *Kirk v. Bray*, 181 Ga. 814, 818 (184 SE 733)

15

(1935). However, as we found in Division 2 herein, the Counties have statutory claims against the Defendants pursuant to OCGA §§ 51-1-6 and 51-1-8 to enforce the duty imposed upon the Defendants by the 9-1-1 Act. And, even if we were to assume that such claims are really claims at common law, the Counties have complained that *T-Mobile* was wrongfully decided or inapplicable to the facts of this case. As explained below, we vacate the trial court's decision on the issue of whether the 9-1-1 Act charges are a tax or a fee, and remand for further consideration.

"Although it is often important to decide whether a particular charge is a fee or a tax, it is frequently difficult to discern whether a given enactment provides for a regulatory fee or authorizes simply a tax." *Hadley v. City of Atlanta*, 232 Ga. App. 871, 872 (1) (502 SE2d 784) (1998). The distinction between a tax and a fee "is not one of names but of substance." *Richmond County Business Assoc. v. Richmond County*, 224 Ga. 854, 856 (1) (165 SE2d 293) (1968). Our Supreme Court has defined a tax as "an enforced contribution exacted pursuant to legislative authority for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for a special privilege or a service rendered." (Citation and punctuation omitted; emphasis supplied.) *McLeod v. Columbia County*, 278 Ga. 242, 244 (2) (599 SE2d 152) (2004). A charge is generally not a tax if its purpose and objective is to

16

compensate for services rendered. Id. Additional factors which distinguish a fee from

a tax:

> First, taxes are a means for the government to raise general revenue and usually are based on ability to pay (such as property or income) without regard to direct benefits which may inure to the payor or to the property taxed. Fees, on the other hand, are intended to be and should be clearly described as a charge for a particular service provided. Second, fees should apply based on the contribution to the problem. Third, fee payers, unlike tax payers, should receive some benefit from the service for which they are paying, although the benefits may be indirect or immeasurable.

(Citation and punctuation omitted.) Id. See also *Homewood Village, LLC v. Unified

Govt. of Athens-Clarke County*, 292 Ga. 514, 515 (1) (739 SE2d 316) (2013). The last

factor set forth in *McLeod,* supra – that fee payers, unlike tax payers, should receive

some benefit from the service for which they are paying, although the benefits may

be indirect or immeasurable – cannot be determined without further evidentiary

proceedings.[11]

The Defendants and the amicus briefs argue that the trial court ignored binding

precedent in *T-Mobile*, supra. In *T-Mobile*, supra, this Court held that the 9-1-1

---

[11] We note that the order appealed was pursuant to a Motion to Dismiss where no evidence was considered.

17

charges collected in advance at the point of sale for prepaid wireless services were a tax because, inter alia, those upon whom the charge was imposed did not receive a special benefit not received by others and the charge was for the purpose of raising general revenue. Id. at 470-471 (2).

However, we find that *T-Mobile*[12] is potentially distinguishable from the instant case because it involved a "taxpayer" seeking a refund for "taxes" that it mistakenly paid or was illegally required to pay, while in this case the Counties aren't seeking to collect monies which were owed by the Defendants as "taxpayers," but to collect monies which the Defendants had a duty to collect *for* the Counties. Also, *T-Mobile* arguably is distinguishable from the instant case because the residents of the plaintiff Counties allegedly receive a special benefit not received by residents of other counties in Georgia or by persons simply passing through the Counties who call 9-1-1. The 9-1-1 Act grants autonomy to each local government to establish its own 9-1-1 services if it so chooses and the amount of fees to be imposed up to the $1.50 maximum set forth under the 9-1-1 Act. OCGA § 46-5-133 (a). The Counties argue that, although all members of the public with telephone service may access Georgia's

---

[12] While we do not endeavor herein to determine, the Counties contend that *T-Mobile* was wrongly decided. We defer consideration of such issue until after the trial court further considers the fee versus tax issue on remand.

18

9-1-1 systems, the citizens in Cobb and Gwinnett counties who incur the 9-1-1 charges receive enhanced 9-1-1 benefits and services. The Counties contend that the evidence in this case will

> show that while some local governments provide no 9-1-1 services at all, Cobb and Gwinnett Counties provide enhanced landline 9-1-1 services that use special computer software to display the caller's home address and location on a map. Residents may even have "Smart 9-1-1" services that allow them to pre-register their anticipated 9-1-1 needs for special circumstances, such as "senior with Alzheimer's" or "child with disability." Indeed, because different local governments offer different 9-1-1 services, and none are authorized to accumulate more charges than their actual service costs, different local governments charge different amounts for 9-1-1 services up to the statutory maximum of $1.50.

If the evidence shows that these assertions are true, then, contrary to the conclusion in *T-Mobile*, supra, not all landline and wireless 9-1-1 services are created equal.

Because the analysis of whether the 9-1-1 Act charges are a tax or a fee, or whether *T-Mobile* was correctly decided in the first instance,[13] could be impacted by and/or turn on whether those upon whom the 9-1-1 charge is imposed receive a special benefit not received by others," there remain questions of fact that must be

---

[13] We note that because *T-Mobile* was an appeal on an order resolving a Motion to Dismiss, it likewise appears to have been decided without the benefit of evidence.

resolved by further evidentiary proceedings by the trial court. See e.g., *Covenant Media of Ga., LLC v. City of Lawrenceville*, 580 F. Supp. 2d 1313, 1315 (1) (N.D. Ga. 2008) ("In a case involving disputed facts, however, it may be necessary to provide an opportunity for discovery and a hearing that is appropriate to the nature of the motion to dismiss") (citation and punctuation omitted). Accordingly, we vacate the trial court's ruling on the motion to dismiss as to whether these charges are a "tax" or a "fee," and we remand the issue for discovery and further evidentiary proceedings.

*Judgment reversed in part, affirmed in part, and vacated in part. Self, J., concurs fully and also concurs in Division 1 and Division 2 of the special concurrence. Dillard, P. J., concurs fully with Division 1 and Division 2, concurs in the judgment only as to Division 3, and also specially concurs.*

A17A0265. BELLSOUTH TELECOMMUNICATIONS LLC d/b/a/

AT&T GEORGIA et al. v. COBB COUNTY GEORGIA, et al.


DILLARD, Presiding Judge, concurring fully and specially.

I concur fully with the majority's holdings in Divisions 1 and 2 that the 9-1-1 Act does not provide the Counties with a private right of action, explicitly or otherwise, to enforce its provisions against telephone-service providers such as the Defendants, but that the 9-1-1 Act, read in conjunction with OCGA § 51-1-6,[1] provides the Counties with a potentially viable avenue for relief such that their complaints should not be dismissed at this early stage of the proceedings. Nevertheless, because litigants often seek to persuade this Court to recognize implied causes of action and to invoke OCGA § 51-1-6 as a way of circumventing a statute that does not authorize a litigant to seek enforcement of its provisions, I write

---

[1] The trial court below and Defendants (on appeal) reference OCGA § 51-1-8 in passing, but their primary focus is on OCGA § 51-1-6 and its accompanying caselaw. Indeed, the Defendants cite only one case that even references OCGA § 51-1-8, and that opinion merely groups it with OCGA § 51-1-6 for the basic proposition that both statutes only authorize recovery of damages for the breach of a legal duty otherwise created. *See Parris v. State Farm Mut. Auto. Ins. Co.*, 229 Ga. App. 522, 524 (494 SE2d 244) (1997). For these reasons, and because a claim brought under OCGA § 51-1-8 is separate and distinct from one brought under OCGA § 51-1-6, my analysis is limited to OCGA § 51-1-6.

separately to provide further guidance as to the current state of Georgia law regarding these issues. Finally, as to Division 3, I disagree with the majority that it is premature to determine whether or not the type of charge imposed by the 9-1-1 Act is a tax or a fee because we have already expressly held, as a matter of law, that the 9-1-1 charge is indeed a tax, and the Defendants have not provided us with a compelling argument for revisiting that holding. That said, because I agree with the majority's ultimate conclusion that the Counties' complaints are sufficient to survive the motion to dismiss and that the case should be remanded for further proceedings, I concur in judgment only as to Division 3.

1. As to the trial court's erroneous finding that the 9-1-1 Act provides an implied cause of action for the Counties to sue the Defendants to enforce its provisions, I write separately to emphasize that, even with regard to statutes enacted prior to the effective date of OCGA § 9-2-8,[2] Georgia law does not recognize implied

---

[2] As noted by the majority, OCGA § 9-2-8 (a) provides that "[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is *expressly* provided therein." (emphasis supplied). Subsection (b) of OCGA § 9-2-8 provides that "[n]othing in subsection (a) of this Code section shall be construed to prevent the breach of any duty imposed by law from being used as the basis for a cause of action under any theory of recovery otherwise recognized by law, including, but not limited to, theories of recovery under the laws of tort or contact or for breach of legal or private duties as set forth in Code Sections 51-1-6 and 51-18 or Title 13."

2

causes of actions. In our state, a private right of action cannot be based solely on speculation regarding the "intent" of the General Assembly[3] when there is no

---

[3] In my view, our appellate courts should stop referencing altogether the ethereal fiction of "legislative intent" in the context of statutory interpretation. A judge should not care about what any legislator intended but did not expressly provide for in the statutory text. *See King v. Burwell*, ___ U.S. ___ (135 SCt 2480, 2505 (V), 192 LEd2d 483) (2015) (Scalia, J., dissenting) ("More importantly, the Court forgets that ours is a government of laws and not of men. That means we are governed by the terms of our laws, not by the unenacted will of our lawmakers."). If the General Assembly "enacted into law something different from what it intended, then it should amend the statute to conform to its intent." *Id*. (citation and punctuation omitted); *accord Lamie v. U.S. Trustee*, 540 U. S. 526, 542 (III) (124 SCt 1023, 157 LEd2d 1024) (2004); *see Malphurs v. State*, 336 Ga. App. 867, 870-71 (2016) (Peterson, J.) ("The General Assembly does not enact general intention; it enacts statutes. Statutes have words, and words have meanings. It is those meanings that we interpret and apply, not some amorphous general intention."). And as for the notion that judges are somehow able to discern the collective intent of a legislative body, that is "[p]ure applesauce." *King*, 135 SCt at 2505 (II) (Scalia, J., dissenting); s*ee In re Whittle*, 339 Ga. App. 83, 85-86 (1) (793 SE2d 123) (2016) ("[I]n the context of legislation, discerning 'collective intent is pure fiction because dozens if not hundreds of legislators have their own subjective views on the minutiae of bills they are voting on—or perhaps no views at all because they are wholly unaware of the minutiae.'") (citation omitted)). Judges are not in the business of divining unexpressed legislative intent, nor are we capable of doing so with any reasonable degree of accuracy. As Judge Bethel (a former legislator) has aptly noted, "[a]ny attempt to discern legislative intent beyond the express language passed by a legislative body is as practical and productive as attempting to nail Jello to the wall." *Bishop v. State*, No. A17A0569, 2017 WL 2450771, at *3 (Ga. App. June 6, 2017) (Bethel, J., concurring). I agree. Judges are trained to interpret the meaning of the words expressly ratified by the people or enacted by their representatives in a manner consistent with longstanding canons of construction. Thus, when judges speak as if they are engaging in some mystical search for the legislature's unexpressed intent (in the context of statutory interpretation), they create an impression that is both

3

indication in the text of the statute itself that such a cause of action exists. Indeed, in determining whether a private right of action is authorized by a statute, "[t]he judicial task is . . . to interpret the statute the General Assembly has passed to determine whether it displays an intent to create not just a private right of action but also a private remedy."[4] And statutory "intent," as reflected by the plain meaning of the relevant text, on this latter point is "determinative."[5] Thus, it is entirely irrelevant that the trial court found it to be "implausible" that the General Assembly would enact the

---

misleading and squarely at odds with the judicial duty. It is time to state plainly what is already manifestly true: What legislators intend but do not expressly provide for in the text of a statute is meaningless. I realize, of course, that OCGA § 1-3-1 (a) provides that "[i]n the interpretation of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy," but this statutory directive must be read in conjunction with OCGA § 1-3-1 (b), which provides that "[i]n all interpretations of statutes, the ordinary signification shall be applied to all words . . . ." In any event, the General Assembly can no more tell the judiciary how to *generally* interpret the law than we can direct them how to legislate. The separation of powers is essential to the maintenance of our constitutional republic, and it is high time that our discussion of statutory interpretation reflects the reality of our jurisprudence and acknowledges the strict demarcation line between judicial interpretation and legislating. We are judges, not black-robed philosophers.

[4] *Somerville v. White*, 337 Ga. App. 414, 416 (1) (787 SE2d 350) (2016) (punctuation omitted); *accord Alexander v. Sandoval*, 532 U.S. 275, 286 (II) (121 SCt 1511, 149 LEd2d 517) (2001); *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (122 SCt 2268, 153 LEd2d 309) (2002).

[5] *Somerville*, 337 Ga. App. at 416-17 (1); *see Sandoval*, 532 U.S. at 286 (II).

4

9-1-1 statute without providing a cause of action against telephone-service providers to enforce its provisions because that is exactly what it did. Bottom line: In the absence of an explicit textual basis, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."[6] As we have previously explained, "[i]t is wholly inappropriate, as well as constituting a clear violation of the separation of powers, for this Court to fashion causes of action out of whole cloth, regardless of any perceived public policy benefit."[7]

Thus, I take this opportunity to reiterate that, so long as the meaning of the relevant statutory text is plain and does not lead to an absurd result, that is the end of our inquiry.[8] Indeed, it is deeply troubling when

---

[6] *Somerville*, 337 Ga. App. at 417 (1); *see Sandoval*, 532 U.S. at 286-87 (II).

[7] *Somerville*, 337 Ga. App. at 417 (1) (punctuation omitted) (quoting *Schroeder v. Hamilton School Dist.*, 282 F3d 946, 951 (II) (7th Cir. 2002) (Manion, J.)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (II) (118 SCt 1003, 140 LEd2d 210) (1998) (holding that "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts" (punctuation and citation omitted)).

[8] *See Shorter Coll. v. Baptist Convention of Ga.*, 279 Ga. 466, 470 (1) (614 SE2d 37) (2005); *Ray v. Barber*, 273 Ga. 856, 856 (1) (548 SE2d 283) (2001); *see also City of Atlanta v. Miller*, 256 Ga. App. 819, 820 (1) (569 SE2d 907) (2002) ("In construing a legislative act, a court must first look to the literal meaning of the act.

5

judges start discussing not the meaning of the statutes the legislature actually enacted, as determined from the text of those laws, but rather the unexpressed "spirit" or "reason" of the legislation, and the need to make sure the law does not cause "unreasonable consequences," [thus venturing] into dangerously undemocratic, unfair, and impractical territory. The "spirit or reason" approach to statutory interpretation invites judges to read their own policy preferences into the law, as we all believe that our own policy preferences are wise and reasonable, which tempts us to assume, consciously or unconsciously, that the legislature could not have intended differently.[9]

---

If the language is plain and does not lead to any absurd or impracticable consequences, the court simply construes it according to its terms and conducts *no further inquiry*." (punctuation omitted and emphasis supplied)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 397 (1ˢᵗ ed. 2012) ("Intentionalist theorists and courts promote the idea that enacted texts merely evoke or suggest—as opposed to state—what the true law is . . . . If this were true, then it would hardly be possible ever to reach a consensus about the law. The traditional view is that an enacted text is itself the law."); *id*. at 376 ("[T]hat the legislature even *had* a view on the matter at issue . . . is pure fantasy. In the ordinary case, most legislators could not possibly have focused on the narrow point before the court [and] the few who did undoubtedly had varying views.").

[9] *Merritt v. State*, 286 Ga. 650, 656 (690 SE2d 835) (2010) (Nahmias, J., concurring specially); *accord Callaway Blue Springs, LLLP v. W. Basin Capital, LLC*, No. A17A0130, 2017 WL 2417779, at *5 (1) (Ga. App. June 5, 2017).

As Georgians (and Americans), we are "governed by laws, not by the intentions of legislators."[10] And as judges, we should only be concerned with what laws actually say, "not by what the people who drafted the laws intended."[11] Suffice it to say, the trial court erred in disregarding these well-established principles and finding that the 9-1-1 Act provides an implied cause of action under the circumstances of this case.

2. I also fully concur with the majority's holding that OCGA § 51-1-6 provides the Counties with a potentially viable cause of action to enforce the Defendants' duties imposed by the 9-1-1 Act. Nevertheless, because litigants routinely invoke OCGA § 51-1-6 in an attempt to enforce statutory provisions that do not give them the right to do so, I write separately to emphasize that the cause of action authorized by OCGA § 51-1-6 arises only in limited circumstances, and several requirements must be satisfied before a viable claim may be brought under the statute. As noted by the majority, OCGA § 51-1-6 provides that "[w]hen the law requires a person to

---

[10] *Conroy v. Aniskoff*, 507 U.S. 511, 519 (113 SCt 1562, 123 LE2d 229) (1993) (Scalia, J., concurring); *accord Callaway Blue Springs, LLLP*, 2017 WL 2417779, at *5 (1); *Day v. Floyd Cty. Bd. of Educ.*, 333 Ga. App. 144, 151 (775 SE2d 622) (2015) (Dillard, J., concurring).

[11] SCALIA & GARNER, *supra* note 8, at 16; *accord Callaway Blue Springs, LLLP*, 2017 WL 2417779, at *5 (1); *Day*, 333 Ga. App. at 151 (Dillard, J., concurring).

7

perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." But as we have repeatedly explained, the alleged duty cannot rest solely upon OCGA § 51-1-6 because that statute merely sets forth general principles of tort law.[12] Thus, the legal duty necessary to support a claim under OCGA § 51-1-6 "must be found in another legislative enactment[,]"[13] which in this case is the 9-1-1 Act.[14]

---

[12] *See Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 164 (744 SE2d 686) (2013) (noting that a plaintiff cannot sue for the breach of an alleged duty based solely on OCGA § 51-1-6); *Gobran Auto Sales, Inc. v. Bell*, 335 Ga. App. 873, 877 (2) (783 SE2d 389) (2016) (explaining that OCGA § 51-1-6 "do[es] not create causes of action, but simply set[s] forth general principles of tort law, authorizing the recovery of damages for the breach of a legal duty otherwise arising, though not expressly stated, under a statute or common law"); *Parris*, 229 Ga. App. at 524 ("OCGA § 51-1-6, standing alone, creates no cause of action. Rather, it simply authorizes the recovery of damages for the breach of a legal duty otherwise created."); *see also Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 705 (746 SE2d 173) (2013) ("OCGA § 51-1-6 does not create a legal duty but defines a tort and authorizes damages when a legal duty is breached." (punctuation omitted)).

[13] *Jenkins*, 293 Ga. at 164; *accord McConnell v. Dep't of Labor*, 337 Ga. App. 457, 459 (1) n.3 (787 SE2d 794) (2016).

[14] While OCGA § 51-1-6 "set[s] forth general principles of tort law," *Bell*, 335 Ga. App. at 877 (2), OCGA § 51-1-6 claims are typically evaluated under the same legal framework as negligence *per se* claims, which makes sense because such claims, like those under OCGA § 51-1-6, seek damages for the violation of a statute. *See Goldstein Garber & Salama, LLC v. J.B.*, No. S16G0744, (797 SE2d 87 (2)) (Ga. Feb. 27, 2017) ("[N]egligence per se arises when a statute is violated, the person

8

The Defendants have cited our Supreme Court's decision in *Wells Fargo Bank, N.A. v. Jenkins*,[15] and this Court's decisions in *Parris v. State Farm Mutual Automobile Insurance Co.*[16] and *Best Jewelry Manufacturing, Co. v. Reed Elsevier, Inc.*[17] to support their argument that, if the statute imposing the legal duty does not provide a plaintiff with a private right of action, neither does OCGA § 51-1-6. They contend that the Counties cannot bring a claim under OCGA § 51-1-6 for a violation of the 9-1-1 statute solely because the 9-1-1 statute does not authorize such a claim. But this argument misconstrues the holdings in the cases cited *supra* and conflicts with the plain language of OCGA § 51-1-6, which only applies when "no cause of action is given in [the underlying statute's] express terms." Furthermore, in *Jenkins*,

---

injured by the violation is within the class of persons the statute was intended to protect, and the harm complained of was the harm the statute was intended to guard against." (punctuation omitted)); *Brown v. Belinfante*, 252 Ga. App. 856, 861 (1) (557 SE2d 399) (2001) ("In determining whether the violation of a statute or ordinance is negligence per se as to a particular person, it is necessary to examine the purposes of the legislation and decide (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm it was intended to guard against." (punctuation omitted)). Thus, OCGA § 51-1-6 does not necessarily authorize *any* type of tort claim merely because an alleged statutory violation satisfies its requirements.

[15] 293 Ga. 162 (744 SE2d 686) (2013).

[16] 229 Ga. App. 522 (494 SE2d 244) (1997).

[17] 334 Ga. App. 826 (780 SE2d 689) (2015).

9

the Supreme Court of Georgia held that an alleged violation of a federal statute did not give rise to a negligence claim under OCGA § 51-1-6 because the plaintiff did not show that there was a violation of *any* duty imposed by the federal statute, not because the federal statute did not provide the plaintiff with a cause of action to enforce its terms.[18] And in reaching this conclusion, the *Jenkins* Court emphasized that, "[i]n order for a plaintiff to invoke OCGA § 51-1-6, there *must be the alleged breach* of a legal duty with some ascertainable standard of conduct."[19] As for *Parris* and *Best Jewelry*, the Defendants are simply mistaken that, despite the express language of OCGA § 51-1-6 providing otherwise, we nevertheless held in those cases that OCGA § 51-1-6 only authorizes claims when those claims are *also* authorized by the underlying statute imposing the relevant duty. While it is certainly true that some of the language employed in those cases is rather cursory and less than precise, it is likewise manifestly evident that OCGA § 51-1-6 may only be used to provide a cause of action to enforce a legal duty imposed by a different statute that does not otherwise authorize such an action itself. And, of course, plaintiffs have been allowed by

---

[18] *See Jenkins*, 293 Ga. at 164.

[19] *Id.* (emphasis supplied).

10

Georgia courts to pursue claims under OCGA § 51-1-6 under those exact circumstances in numerous cases.[20]

But even though OCGA § 51-1-6 can provide a private right of action to enforce a duty imposed by a different statute, in order to successfully assert a claim under OCGA § 51-1-6, the alleged duty arising from the other statute must be *mandatory* and imposed *expressly* by the statute at issue with specificity.[21] Not only that, the legal duty at issue must specifically impose "some ascertainable standard of conduct."[22] And even if such a statutorily-mandated duty exists, a plaintiff cannot

---

[20] *See, e.g.*, *Simerly*, 322 Ga. App. at 705-06 (3) (holding that the plaintiffs' claims regarding the defendant's noncompliance with various federal and state statutes relating to environmental protection "[fell] within the ambit of OCGA § 51-1-6"); *Combs v. Atlanta Auto Auction, Inc.*, 287 Ga. App. 9, 12 (2) (650 SE2d 709) (2007) (holding that a plaintiff could pursue a negligence claim under OCGA § 51-1-6 based on the defendant's alleged violation of certain zoning ordinances); *Ford v. Saint Francis Hosp., Inc.*, 227 Ga. App. 823, 827 (490 SE2d 415) (1997) (affirming the trial court's denial of a directed verdict in favor of the defendant on a negligence *per se* claim brought under OCGA § 51-1-6 based on a hospital's noncompliance with federal regulations governing infection control).

[21] *See Schaff v. Snapping Shoals Elec. Membership Corp.*, 330 Ga. App. 161, 164 (2) (767 SE2d 807) (2014) (holding that the plaintiff failed describe the alleged statutory duties with enough specificity to support a negligence *per se* claim brought under OCGA § 51-1-6); *Hubbard v. Dep't of Transp.*, 256 Ga. App. 342, 351 (3) (568 SE2d 559) (2002) (affirming partial summary judgment in favor of the defendant as to the plaintiff's negligence claim asserted under OCGA § 51-1-6 because the statutory duties identified by the plaintiff were not mandatory).

[22] *See Jenkins*, 293 Ga. at 164.

recover under OCGA § 51-1-6 unless the duty set forth in the other statute is expressly owed to the plaintiff, who must "fall[ ] within the class of persons it was intended to protect."[23] Thus, the fact that a plaintiff might have some unintended or

---

[23] *Norman v. Jones Lang Lasalle Americas, Inc.*, 277 Ga. App. 621, 628 (2) (b) (627 SE2d 382) (2006) (punctuation omitted); *see Newman v. Johnson*, 319 Ga. App. 307, 309 (733 SE2d 520) (2012) (rejecting a claim based on OCGA § 51-1-6 when the plaintiff was not in the class of persons for whose benefit the statute from which the alleged duty arose was enacted); *Jenkins v. Wachovia Bank, Nat. Ass'n*, 309 Ga. App. 562, 566 (2) (711 SE2d 80) (2011) (holding that a plaintiff could not sue to enforce a check, which was allegedly paid by a bank "over a forged endorsement" when the bank's alleged wrongful actions were not violations of any legal right of or duty owed to the plaintiff); *R & R Insulation Servs., Inc. v. Royal Indem. Co.*, 307 Ga. App. 419, 424-25 (1) (705 SE2d 223) (2010) (noting that to recover under a theory of negligence *per se* under OCGA § 51-1-6, a plaintiff must show that he or she fell within the persons that the underlying statute was intended to protect); *DaimlerChrysler Motors Co., LLC v. Clemente*, 294 Ga. App. 38, 47 (2) (a) (668 SE2d 737) (2008) (holding that the plaintiff could not assert a claim under OCGA § 51-1-6 (or OCGA § 51-1-8) against a car dealership's franchisor for a violation of the Georgia Motor Vehicle Franchise Practices Act when that Act regulated the relationship between automobile franchisors and their franchisee dealers and did not impose any legal duty upon automobile franchisors owed to the franchisee's *consumers*); *Benefit Support, Inc. v. Hall Cty.*, 281 Ga. App. 825, 832 (637 SE2d 763) (2006) (holding, in the context of rejecting a OCGA § 51-1-6 claim, that the generic statement in OCGA § 33-23-5 (a) that it is "for the protection of the people of this state" does not expand the intent of the statute requiring licensure for counselors to benefit businesses that provide insurance); *Brantley v. Custom Sprinkler Sys., Inc.*, 218 Ga. App. 431, 432 (1) (461 SE2d 592) (1995) (holding that the defendant was entitled to summary judgment as to the plaintiff's OCGA § 51-1-6 claim because plaintiff was not an employee of defendant, and "therefore was not [a] person intended to be benefitted by the . . . regulations upon which he relie[d]" in conjunction with OCGA § 51-1-6).

incidental benefit from the defendant's compliance with a statutorily imposed duty is insufficient to support a claim under OCGA § 51-1-6.[24] Furthermore, even when the plaintiff is the intended beneficiary of such a duty, a successful claim under OCGA § 51-1-6 requires that there has actually been a violation of that duty on the part of the defendant.[25]

In addition to satisfying the foregoing requirements, a plaintiff asserting a claim under OCGA § 51-1-6 must have suffered damages or harm resulting from the defendant's violation of a legal duty owed to the plaintiff.[26] And plaintiffs must also

[24] *See U.S. Bank, N.A. v. Phillips*, 318 Ga. App. 819, 826 (3) (734 SE2d 799) (2012) (holding that OCGA § 51-1-6 did not apply to the plaintiff homeowner because, "[w]hile homeowners incidentally benefit from [the Home Affordable Modification Program (HAMP)]'s incentives, homeowners are not intended third-party beneficiaries to whom servicers owe a legal duty under HAMP")

[25] *See Rowell v. Phoebe Putney Meml. Hosp., Inc.*, 338 Ga. App. 603, 606-07 (791 SE2d 183) (2016) (affirming grant of summary judgment because, although "[a] hospital has a legal duty to follow its existing bylaws and any alleged breach of that duty can be asserted as a cause of action under OCGA § 51-1-6[,]" there was no evidence that hospital breached that duty); *Simon Prop. Grp., Inc. v. Benson*, 278 Ga. App. 277, 279 n.7, 281-82 (628 SE2d 697) (2006) (reversing the trial court's order, which found that the plaintiff could sue to enforce a statute's provisions under OCGA § 51-1-6, because there was no violation of the underlying statute).

[26] *See Legacy Acad., Inc. v. Doles-Smith Enterprises, Inc.*, 337 Ga. App. 575, 583-84 (2) (789 SE2d 194) (2016) (holding that the "[p]laintiffs failed as a matter of law to establish any economic damages to support their claim for negligence under OCGA § 51-1-6, and thus, the trial court should have granted the [defendants'] motions for directed verdict and j.n.o.v. as to that claim); *Sofet v. Roberts*, 185 Ga.

13

show that "the harm complained of was the harm the statute was intended to guard against."[27] Finally, as with any negligence claim, OCGA § 51-1-6 requires a causal connection between the defendant's violation of a statutory duty and the injuries sustained by the plaintiff.[28]

In sum, to establish a negligence *per se* claim under OCGA § 51-1-6, a plaintiff must show that (1) the defendant violated a specific statutory duty, (2) the duty is mandatory and expressly imposed, (3) the plaintiff is in the class of persons that the statutory duty was intended to protect, (4) the plaintiff suffered the type of harm that the duty was intended to guard against, and (5) the defendant's breach of that duty caused the plaintiff's injuries. And here, it remains to be seen whether the Counties can present sufficient evidence to satisfy each of these requirements with respect to

App. 451, 452 (2) (364 SE2d 595) (1987) (affirming the dismissal of a negligence claim brought under OCGA § 51-1-6 when the plaintiff did not allege that the defendant's negligence caused him damage to his person or property); *Hodges v. Tomberlin*, 170 Ga. App. 842, 845 (3) (319 SE2d 11) (1984) (holding that the plaintiffs failed to state a right to recovery under OCGA § 51-1-6 when they suffered no damage as a result of the defendants' conduct).

[27] *Norman*, 277 Ga. App. at 628 (2) (b) (punctuation omitted); *accord Combs*, 287 Ga. App. at 12 (2); *Hubbard*, 256 Ga. App. at 350 (3).

[28] *See Norman*, 277 Ga. App. at 628 (2) (b) (holding, in evaluating a claim brought under OCGA § 51-1-6, that "if the court finds negligence per se, the plaintiffs must then demonstrate a causal connection between the negligence per se and the injury); *Hubbard*, 256 Ga. App. at 350 (3) (same).

the Defendants' alleged violations of the 9-1-1 Act. That said, at this stage in the proceedings, the allegations in the Counties' complaints are at least sufficient to withstand a motion to dismiss. Nevertheless, litigants should be cautioned that the mere fact that a plaintiff is negatively impacted or harmed by a defendant's violation of a statutorily imposed duty is insufficient, in and of itself, to successfully plead and maintain a claim under OCGA § 51-1-6, and this is true regardless of how egregious the defendant's conduct may be or how seemingly unfair it is to the plaintiff.

3. As previously mentioned, I concur with the majority's ultimate conclusion that the Counties' complaints are sufficient to withstand a motion to dismiss, and I agree that the case should be remanded for further proceedings consistent with this Court's opinion. Nevertheless, I concur in judgment only as to Division 3 of the majority's opinion because I do not agree with all that is said in reaching that conclusion. According to the majority, the trial court's finding that the charge the Defendants are required to exact from their customers under the 9-1-1 Act is a fee, rather than a tax, is premature, and the parties, upon remand, should be allowed to present evidence to aid the court in deciding that issue. I respectfully disagree. This Court has already considered the charge exacted under the 9-1-1 Act and expressly held, as a matter of law, that the type of charge authorized by and imposed under the

15

Act is a tax. And the trial court, which is bound by the decisions of this Court, erred in holding otherwise. But for the reasons set forth *infra*, the trial court's error in this regard is irrelevant to our resolution of this appeal.

In *Fulton County v. T-Mobile, S., LLC*,[29] this Court considered, as a matter of first impression, "whether the 9-1-1 charge *authorized by the Act* is properly classified as a 'tax' *under Georgia law*."[30] In doing so, we relied on several Supreme Court of Georgia cases addressing whether payments made in other contexts were taxes or fees, decisions of other jurisdictions considering this issue with respect to their similar 9-1-1 statutes, and the provisions and stated purpose of the 9-1-1 Act itself.[31] And ultimately, without ever mentioning the manner in which the 9-1-1 charge had been imposed by Forsyth County in that particular case, we concluded that "the 9-1-1 charge *is a tax*."[32] In reaching this conclusion, we did not reference any facts or evidence unique to the *T-Mobile* case, and we did not include any caveats or

---

[29] 305 Ga. App. 466 (699 SE2d 802) (2010).

[30] *Id.* at 469 (2) (emphasis supplied).

[31] *See generally id.* at 469-74 (2).

[32] *Id.* at 473 (2) (emphasis supplied).

16

limiting language suggesting that, under different factual circumstances in another County, the type of charge that the Act imposed might not be a tax.[33]

Nevertheless the trial court attempted to distinguish *T-Mobile* by suggesting that the sole basis for our holding was that the residents in Fulton County who paid the charge "receive no benefit not received by the general public, because all members of the general public *may access* the 9-1-1 system."[34] But the "public benefit" factor was only one of several factors that we considered in *T-Mobile*. For example, we evaluated whether the charge was voluntary and whether it was imposed to raise revenue for a public or governmental purpose.[35] And in considering whether the charge was for the benefit of the public, we relied on an extra-jurisdictional opinion addressing a similar 9-1-1 statute, which explained that the charge is not for the *use* of the 9-1-1 service like a payment for services rendered, but for *access* to the 9-1-1 system, regardless of whether or not a resident ever places an emergency call.[36] Thus, while there may be some additional benefits to a resident if he or she actually

---

[33] *See id.* at 469-74 (2).

[34] (Emphasis supplied).

[35] *See generally T-Mobile*, 305 Ga App. at 469-74 (2).

[36] *Id*. at 472 (2).

17

places an emergency call, the Counties have never alleged that their 9-1-1 systems are not accessible to the general public. Given the foregoing, the trial court's finding that 9-1-1 charges are fees is foreclosed by binding precedent, and no further evidence is needed to resolve that issue.[37]

But unlike in *T-Mobile*, the issue of whether the 9-1-1 charge authorized by the Act is a tax is not the "dispositive issue in this case."[38] Indeed, in *T-Mobile*, a telephone-service provider sought a tax refund from Forsyth County, and we held that it was authorized to do so under OCGA § 48-5-380, which applies to the overpayment of taxes to counties and municipalities.[39] And as noted by the majority, the

---

[37] *See Smith v. Baptiste*, 287 Ga. 23, 25 (1) (694 SE2d 83) (2010) ("The application of the doctrine of stare decisis is essential to the performance of a well-ordered system of jurisprudence." (punctuation omitted)); *A & A Heating & Air Conditioning Co. v. Burgess*, 148 Ga. App. 859, 860 (1) (253 SE2d 246) (1979) ("Even those who regard 'stare decisis' with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute. Once the court interprets the statute, the interpretation has become an integral part of the statute. This having been done, any subsequent 'reinterpretation' would be no different in effect from a judicial alteration of language that the General Assembly itself placed in the statute." (punctuation and citations omitted)); Ga. Const of 1983, Art. VI, Sec. V, Par. III ("The decisions of the Court of Appeals insofar as not in conflict with those of the Supreme Court shall bind all courts except the Supreme Court as precedents.").

[38] *T-Mobile*, 305 Ga App. at 462 (2).

[39] *See id.* at 466; *see also* OCGA § 48-5-380.

Defendants contend that, if the 9-1-1 charge is a tax, the case must be dismissed because a common-law action for the recovery of taxes is impermissible. But here, the Counties are not suing a taxpayer for the recovery of taxes. Instead, they assert a *statutory claim* under OCGA § 51-1-6 for a violation of a legal duty, as well as common-law claims to recover *damages* resulting from alleged negligence, fraud, and breach of fiduciary duty. But while none of these claims directly seek to collect unpaid taxes, "a party cannot survive a motion to dismiss merely by recasting alleged statutory or constitutional violations as torts."[40] Thus, to the extent that any of the Counties' common-law claims do nothing more than seek damages for a violation of

---

[40] *Best Jewelry Manufacturing, Co.*, 334 Ga. App. at 835 (3) (a); *see Troncalli v. Jones*, 237 Ga. App. 10, 12-13 (1) (514 SE2d 478) (1999) (reversing jury verdict as to a tort claim for civil-stalking because nothing in the statute that defines the crime of stalking creates a private cause of action in tort in favor of the victim); *Rolleston v. Huie*, 198 Ga. App. 49, 50 (2) (400 SE2d 349) (1990) (holding that there is no tort remedy available under OCGA § 16-8-16 for the allegedly unlawful attempt to disseminate information tending to impair appellant's business because that statute does not create a cause of action in tort in favor of the plaintiff).

the 9-1-1 Act, they must be dismissed.[41] The Counties' claim under OCGA § 51-1-6, however, lives to fight another day.

I am authorized to state that Judge Self joins this concurrence in Divisions 1 and 2.

---

[41] In *Anthony v. Am. Gen. Fin. Servs., Inc.*, 287 Ga. 448 (697 SE2d 166) (2010), the Supreme Court of Georgia held that "a private civil cause of action may not be implied to remedy a violation of OCGA § 45-17-11[,]" which is a criminal statute that regulates the conduct of notaries public. *Id.* at 449 (2) (d). Nevertheless, the Court explained that its holding "d[id] not necessarily mean that the [plaintiffs] [we]re without any remedy, as they may be able to pursue civil liability against [the defendant] under other applicable tort or contract laws of this State." *Id.* The *Anthony* Court expressed "no opinion on the viability of such other potential theories of liability." *Id.* Similarly, here, I express no opinion as to the viability of any potential theories of liability that the Counties might have in addition to their OCGA § 51-1-6 claim.